United States District Court
Southern District of Texas

**ENTERED**

June 09, 2026

Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| Wilmar Oleo North America LLC, | § § § § | |
| *Plaintiff,* | § § | Civil Action No. 4:24-cv-03171 |
| v. | § § | |
| Eastman Chemical Company, | § § § | |
| *Defendant.* | § § § | |

## <u>MEMORANDUM, RECOMMENDATION, AND ORDER</u>

This is a breach of contract dispute. Defendant Eastman Chemical Company moved for summary judgment on all of Plaintiff Wilmar Oleo North America LLC's claims. Dkt. 51. Eastman also moved to exclude Wilmar's damages expert Karl L. Killian. Dkt. 53. After carefully reviewing the motions, Wilmar's responses, Dkts. 54, 55, Eastman's replies, Dkts. 57, 58, the record, and the applicable law, it is (a) recommended that the motion for summary judgment be granted in part and denied in part, and (b) ordered that the motion to exclude be granted.

## <u>Background</u>

Wilmar sells glycerin, and Eastman buys it. Eastman uses glycerin to produce triacetin, a product it sells to third parties to make cigarette filters.

Dkt. 54-2 at 25-26.[1]  The parties have a "longstanding business relationship …." Dkt. 45 at 3; *see* Dkt. 48 at 2.

The parties' dispute first arose in 2022.  On March 10, 2022, Wilmar's business manager, Tom Ozzella, Dkt. 51-2 at 8, sent an email to Eastman's representative, Andrea Martinez Torres, offering to sell 1,500 metric tons of glycerin at $1.10/lb for the second quarter of 2022, or "Q2."  Dkt. 51-3 at 5. Martinez Torres responded that she was "ok with our normal volume of 1500 +-5% for Q2."  *Id.* at 4.  Ozzella emailed the "Accepted/Confirmed" terms, including "Incoterms: FCA Hudson," to Wilmar and Eastman employees.  *Id.* at 3-4.  Martinez Torres thanked Ozzella before the parties confirmed that the delivery period would be March-June 2022.  *See id.* at 2-4.

On June 14, 2022 Ozzella sent a quote to Eastman for the July-September 2022 delivery period ("third quarter" or "Q3") with several terms, including price ("$1.07/lb" and "$1.06/lb") and quantity ("1,500 MT +/- 5% tolerance").  Dkt. 51-5 at 5-6.  After some back-and-forth over the price, *see id.* at 3-5, Ozzella sent a "confirmation" email to Eastman with the final price ($1.06/lb), quantity (1,500 MT +/- 5% tolerance), "price firm" period (July to September 2022), Incoterms "FCA Hudson" and "FCA Houston," and payment terms.  *Id.* at 2.

---

[1] Most filings in this opinion are cited by the page number in the CM/ECF header. But citations to depositions refer to the page number on the deposition transcripts.

Ultimately, Eastman did not take or pay Wilmar for the full 1,500 metric tons during either the second or third quarter, resulting in a backlog by the end of 2022. *See, e.g.*, Dkt. 51-2 at 191 ("[B]y June of 2022, Eastman had not received or picked up the 1,500 metric tons of glycerin within that quarter ...."); Dkt. 51-9 (Wilmar's interrogatory response); Dkt. 51-4 at 4 (delivery records). The parties dispute, however, whether the backlog resulted from Wilmar's inability to deliver glycerin, Eastman's unwillingness to take the full volume due to its own low product demand, or some combination of both.

According to Wilmar's Ozzella, Eastman would send railcars to a specific terminal where they would be loaded with glycerin from a tank owned or leased by Wilmar. *See* Dkt. 51-2 at 39-40. Ozzella testified, and the parties' correspondence reflects, that Wilmar's logistics team would coordinate loading with the terminal and update Eastman on their progress. *See, e.g.*, Dkt. 51-7 at 3 (Ozzella emails indicating that Wilmar was working with the Hudson terminal on loading and looking for alternative loading locations); Dkt. 51-2 at 92 (Ozzella agreeing that "when Eastman would raise a concern about railcars not being loaded and released quickly enough, Wilmar's response to that was to try to reach out to the terminal to address that issue").

There were delays loading Eastman's railcars in 2022. For example, on May 13, 2022, Eastman's Gabriela Lopez Leon informed Wilmar's team that "railcars load hasn't been as expected" for the March-May 2022 volume.

Dkt. 51-7 at 4.  Eastman had a railcar waiting at Hudson terminal to be loaded for almost a week, resulting in a "backlog." *Id.*  In August 2022, Eastman's Martinez Torres complained to Wilmar's Ozzella that Eastman "had to wait a month for a railcar to be loaded," and that these delays caused a "critical situation with supply …."  Dkt. 51-6 at 2, 10.

Eastman also suffered a product demand drop in the third and fourth quarters of 2022.  *See* Dkt. 54-2 at 90-91.  Martinez Torres anticipated that Eastman would consume only "half of the backlog volume from Q3 and Q4 2022 …."  *Id.*  By mid-December, Eastman halted its operations due to market conditions and low demand.  *See* Dkt. 51-11 at 3-4 (emails).  At the time, its "tanks [were] full" of leftover glycerin.  *Id.*  Martinez Torres told Wilmar that Eastman could not start taking more glycerin until "late Q1" 2023 because its "tank and yard [were] full."  Dkt. 54-4 at 2 (December 20, 2022 email).

By the end of 2022, the parties were negotiating how to move forward for 2023, given this remaining backlog.  *See* Dkt. 51-11 at 2-3.  Eastman's Henrique Britto testified that he and Wilmar's Ranganath Gopalan agreed in December 2022 to "formaliz[e] a writing and sign a document … so [they] will not have any further disputes or discussions."  Dkt. 51-13 at 20-21.  On January 6, 2023, Britto informed Gopalan that he "got the green lights to move forward with the compromising proposal to buy 3,200 MT at a weighted avg price of 75cpp."  Dkt. 51-14 at 5.  That same email included several

"reminders," including that the parties "need to properly document this revised deal" and that they "need to agree to cancel undelivered volume, in case it is caused exclusively by Wilmar failure to deliver." *Id.* Gopalan responded by sending Wilmar's General Terms and Conditions ("GTC") to Eastman and stating that he "look[ed] forward to getting this done, so that we can move on." *See id.* at 4-5; Dkt. 51-15 (GTC). On January 18, 2023 Britto affirmed that Eastman is "good with the agreed commercial terms" but that he will "come back with any proposed changes" to the GTC. Dkt. 51-14 at 2.

Two days later, Wilmar sent an email requesting that Eastman "confirm the following contract" for 3,211.41 metric tons of glycerin at $.75/lb, as well as other terms including the shipment period of February 2023 to December 2023. Dkt. 51-16 at 3 (January 20, 2023 email to, *inter alia*, Eastman's Britto). Eastman responded on January 24, 2023: "We are good with the commercial terms and your calculations reflects [sic] our agreement for 3,211 MT at 75cpp throughout FY2023." Dkt. 51-16 at 2 (Britto's response). The email closed by stating that Eastman would follow up with its "legal department on the GTC review." *See id.*

A few days later, Eastman sent Wilmar a redline of the GTC, which included a proposed term allowing Eastman to cancel a sales order if a shipment arrived two days late. *See* Dkt. 51-19 at 2 (January 27, 2023 email to Wilmar's Gopalan attaching redlines); Dkt. 51-18 at 3 (attachment). In

Gopalan's view, those redlines were "non-material edits." Dkt. 51-1 at 141; *see also id.* at 166 (remaining "noncommercial terms" were "not critical for us to continue with the business"). Although the parties exchanged several versions of the 2023 GTCs, no version of the GTC was ever signed. *See* Dkt. 51-1 at 168.

On February 20, 2023, Eastman's Martinez Torres emailed Wilmar's Gopalan that Eastman would like to "to finalize and sign these [GTCs] so we can start loading." Dkt. 51-20 at 4. From Gopalan's understanding, Eastman had not loaded railcars yet in 2023 "[b]ecause the terms and conditions weren't signed[.]" Dkt. 51-1 at 169. Gopalan responded to the email that Eastman "can commence loading anytime. We will not hold the loading up for the T&C finalization." Dkt. 51-20 at 4; *see also* Dkt. 51-1 at 173-74 (Gopalan Deposition).

Nor did Eastman wait for a complete written agreement. Dkt. 51-1 at 174. Instead, it began sending purchase orders, which Wilmar fulfilled at the $.75/lb unit price until September of 2023, when Eastman told Wilmar that it would not take any more glycerin for the rest of the year. *See* Dkt. 51-22 at 7 (September 1, 2023 email); Dkt. 51-1 at 207 ($.75/lb price for 2023 purchases).

Wilmar filed this suit in state court, asserting breach-of-contract and unjust-enrichment claims. Dkt. 1-3 (original petition). Eastman removed the case to this Court. Dkt. 1 (notice of removal). Wilmar amended its pleading, alleging that Eastman agreed to purchase a certain volume of glycerin at a

6

certain price throughout 2022 and 2023 but then failed to take or pay for the full volume. Dkt. 45.

After discovery closed, Dkt. 49, Eastman filed a motion to exclude the opinions of Wilmar's retained damages expert, Karl L. Killian, Dkt. 50, which motion was stricken as non-compliant, Dkt. 52. It then re-filed a motion to exclude Killian's opinions, Dkt. 53. Wilmar responded, Dkt. 55, and Eastman replied, Dkt. 58.

Eastman also filed a motion for summary judgment. Dkt. 51. Wilmar responded, Dkt. 54, and Eastman replied, Dkt. 57. This Court also directed Wilmar to provide supplemental information, Dkt. 60, which Wilmar then submitted, Dkt. 61. Eastman's motions are ripe for resolution.

## <u>Legal Standard</u>

Summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Westfall v. Luna*, 903 F.3d 534, 546 (5th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material if the issue it addresses "could affect the outcome of the action." *Dyer v. Houston*, 964 F.3d 374, 379-80 (5th Cir. 2020) (quoting *Sierra Club, Inc. v. Sandy Creek Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010)).

When resolving a motion for summary judgment, courts must view the facts and any reasonable inferences "in the light most favorable to the nonmoving party." *Amerisure Ins. Co. v. Navigators Ins. Co.*, 611 F.3d 299, 304 (5th Cir. 2010) (quotation omitted). "[T]he court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party ...." *Union Pac. Res. Grp., Inc. v. Rhone-Poulenc, Inc.*, 247 F.3d 574, 584 (5th Cir. 2001). In addition, courts must credit all reasonable inferences from the evidence, without "weigh[ing] evidence or mak[ing] credibility findings." *Seigler v. Wal-Mart Stores Tex., LLC*, 30 F.4th 472, 476 (5th Cir. 2022). But "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Luna v. Davis*, 59 F.4th 713, 715 (5th Cir. 2023) (quoting *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003)).

## Analysis

### I.   Fact issues preclude summary judgment on most of Wilmar's claims.

Eastman moved for summary judgment on all three of Wilmar's claims for (a) breach of the 2023 contract (Count I); (b) breach of the 2022 contract (Count II); and (c) unjust enrichment (Count III). As concluded below, the record raises genuine issues of material fact on the breach-of-contract claims,

which precludes summary judgment on Counts I and II.  But Eastman is entitled to summary judgment on Count III because the existence of express contracts bars recovery for unjust enrichment.

**A.    There are disputes of fact as to whether the parties intended to be bound by an agreement in 2023.**

For the 2023 breach-of-contract claim, the central dispute is whether the parties intended to be bound by the terms communicated in their January 2023 emails—namely that Eastman would purchase 3,211 metric tons of glycerin from Wilmar at $.75 per pound in 2023.  Both sides refer to the price and quantity as "commercial terms," *see* Dkt. 51 at 7 (Eastman's motion), Dkt. 54 at 13 (Wilmar's response), although Wilmar includes other terms within that phrase as well, *see* Dkt. 54 at 13 (including "product specifications, packing type, transportation mode, shipment period, shipping point, Incoterms, and payment terms," citing Dkt. 51-16 at 3).

According to Eastman, the parties intended to be bound only upon signing a written contract that included all terms—commercial and noncommercial alike—which never happened.  *See* Dkt. 51 at 17-24.  Wilmar responds that there is at least a genuine dispute of material fact over whether Eastman's January 24, 2023 email confirming its assent to price and quantity constituted a binding contract, at least for those terms.  Dkt. 54 at 13.

9

### 1.    UCC contract formation principles

The parties agree that the Texas Uniform Commercial Code (the "UCC") governs this dispute over the sale of glycerin, i.e., a "good" covered by the UCC. *See* Dkt. 51 at 16; Dkt. 54 at 6; Tex. Bus. & Com. Code § 2.105(a) (defining "goods" to include moveable "specially manufactured goods"). Under the UCC, "[a] contract for the sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." *J.D. Fields & Co. v. U.S. Steel Int'l Inc.*, 426 F. App'x 271, 276 (5th Cir. 2011). "Even though one or more terms of the contract are left open, the contract will not fail for indefiniteness so long as the parties intended to make a contract and "there is a reasonably certain basis for giving an appropriate remedy." *ETC Intrastate Procurement Co., LLC v. JSW Steel (USA), Inc.*, 620 S.W.3d 168, 174 (Tex. App.—Houston [14th Dist.] 2021, no pet.) (quoting Tex. Bus. & Com. Code § 2.204(c)).

Indeed, "[t]he UCC tolerates a great deal of incompleteness and even contradiction in offer and acceptance" as its provisions will provide for "gap-filling." *See U.S. Steel Int'l Inc.*, 426 F. App'x at 278 n.6. Put another way, "[t]he fact that one or more terms are left to be agreed upon [is not] enough ... to defeat an otherwise adequate agreement." Tex. Bus. & Com. Code § 2.204(3), cmt.; *see also, e.g., Enpro Sys., Ltd. v. Namasco Corp.*, 382 F. Supp.

2d 874, 880-81 (S.D. Tex. 2005) (acceptance of price, grade, quality, and delivery date formed a contract even without agreement on other terms).

The UCC also has its own rules regarding offer and acceptance. Under the UCC, "[a]n offer is an act that leads the offeree reasonably to believe that assent (i.e., acceptance) will conclude the deal." *Axelson, Inc. v. McEvoy-Willis*, 7 F.3d 1230, 1232-33 (5th Cir. 1993). Regarding acceptance, "unlike the 'mirror image' rule at common law, the mere fact that a merchant's acceptance form contains materially different terms than the offer does not mean that it will be considered a rejection or counter-offer." *Stelluti Kerr, LLC v. Mapei Corp.*, 703 F. App'x 214, 225 (5th Cir. 2017) (per curiam) (citing Tex. Bus. & Com. Code Ann. § 2.207(a)). Rather, "[a] definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, *unless acceptance is expressly made conditional on assent to the additional or different terms.*" Tex. Bus. & Com. Code Ann. § 2.207(a) (emphasis added). The exception in Section 2.207(a) applies "only to an acceptance which clearly reveals that the offeree is unwilling to proceed with the transaction unless he is assured of the offeror's assent to the additional or different terms therein." *Cosden Oil & Chem. Co. v. Karl O. Helm Aktiengesellschaft*, 736 F.2d 1064, 1075 (5th Cir. 1984) (quotation omitted).

11

2.    A trier of fact could conclude that the parties formed a binding contract in 2023.

Eastman relies heavily on certain communications indicating that it wanted a formalized, written, and signed agreement covering the 2023 transaction. *See* Dkt. 51 at 17-19. That, coupled with Wilmar's subjective awareness that Eastman wanted a formal contract that included all terms, purportedly negates the existence of a binding agreement. *See id.* at 18 (citing Gopalan's deposition testimony, Dkt. 51-1 at 120, 132).

But Wilmar maintains that the contract was formed by Eastman's January 24, 2023 email accepting the proposed price, quantity, and delivery period. Dkt. 54 at 13 (citing Dkt. 51-16 at 2-3). After several weeks of negotiations, Wilmar sent an email on January 20, 2023 asking Eastman to "[p]lease confirm the following contract" with a specified quantity (3,211.41 metric tons) and price ($.75/lb), and other terms like the mode of transportation and shipment period (February to December 2023). Dkt. 51-16 at 3. On January 24, 2023 Eastman responded, "We are good with the commercial terms," confirming that Wilmar's "calculation reflects [the parties'] agreement for 3,211 MT at 75cpp throughout FY2023." *Id.* at 2. The email then states that Eastman would follow up on the GTC. *See id.* The parties then exchanged several versions of the GTC but did not finalize it. *See* Dkt. 51-1 at 168.

12

Contrary to Eastman's position, that the January 2023 emails are missing certain terms—including what would happen in the case of undelivered volumes—does not itself negate the existence of a binding contract. *See U.S. Steel Int'l, Inc.*, 426 F. App'x at 278 n.6. Rather, the question is whether Eastman's email accepting the commercial terms was *expressly conditioned* on the parties' agreement to additional terms or the execution of a written contract—namely, the GTC. *See* Tex. Bus. & Com. Code § 2.207(a). Viewing the record, a reasonable juror could reach either conclusion.

On the one hand, Eastman's Britto expressed his desire for a formal contract to Wilmar's Gopalan in December 2022 and again on January 6, 2023. *See* Dkt. 51-13 at 20-21 (Britto testifying that he and Gopalan agreed in December 2022 to "formaliz[e] a writing and sign a document … so [they] will not have any further disputes or discussions"). Eastman touts Britto's email reminding Gopalan that the parties "need to properly document this revised deal so both parties are under mutual agreement of all the terms, to avoid any misunderstand[ing] later on." Dkt. 51 at 18 (quoting Dkt. 51-14 at 4-5). As Eastman observes, Gopalan also testified he "understood that [Eastman] wanted a formal contract that included all the terms." Dkt. 51-1 at 120. He also conceded that Britto's January 6, 2023 email was "connected with [Britto's] previous request to [] provide a formal contract[.]" *Id.* at 102.

13

Nevertheless, other evidence indicates that, over the next few weeks, the parties agreed to the core material terms—volume, price, and delivery period—without conditioning their assent on a signed writing or other requirements. As noted, Eastman declared on January 24, 2023, without qualification, that it was "good with the commercial terms …." Dkt. 51-16 at 2. That email was "devoid of any language which would condition the formation of a contract on some further step …." *See U.S. Steel Int'l, Inc.,* 426 F. App'x at 279 (fact dispute on whether price quote was conditioned on assent to additional terms); *see also Cosden Oil,* 736 F.2d at 1074-75 (rejecting argument that purchase confirmations were not acceptances, although seller had told the buyer "all sales were conditioned upon acceptance of terms," because the parties spoke "only in generalities" without addressing specific terms on which acceptance was conditioned). *Contrast with J.D. Fields & Co., Inc. v. Shoring Eng'rs,* 391 F. Supp. 3d 698, 703-04 (S.D. Tex. 2019) (party "could not have reasonably believed that assent to the price quote would form a contract" when "[t]he quote itself stated that it is 'non-binding,'" and other party made "repeated statements that a purchase order was necessary to conclude the deal"). According to Wilmar's Gopalan, as of that email, "we had an agreement on the commercial terms and conditions," and only the "nonmaterial" issues remained outstanding. Dkt. 51-1 at 116.

14

Moreover, as Wilmar argues, the parties' subsequent performance supplies further evidence that a contract existed. *See* Dkt. 54 at 14. "Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract." Tex. Bus. & Com. Code Ann. § 2.207(c). Here, consistent with its January 24, 2023 email, Eastman purchased glycerin from Wilmar at the specified price of $.75/lb from February 2023 until September 2023. *See* Dkt. 51-1 at 207; Dkt. 51-22 at 7. And as Eastman's representative testified, the price per unit was linked to volume. *See* Dkt. 54-2 at 77. The parties' negotiations also highlight the inextricable tie between the price and volume. Indeed, the proposed price per unit was always paired with a corresponding volume. *See, e.g.*, Dkt. 51-17 at 13-14 (offering $1.06/lb for the remaining Q3 orders already placed, $.80/lb for the remaining Q3 volume, and any new volume at $.46/lb).

Communications relating to performance also suggest that Eastman chose to push ahead even without an agreed GTC. On February 20, 2023, Eastman's Martinez Torres emailed Gopalan that Eastman would like "to finalize and sign these [GTC]s so we can start loading." Dkt. 51-20 at 4. Gopalan understood that Eastman had not loaded railcars yet in 2023 "[b]ecause the terms and conditions weren't signed[.]" Dkt. 51-1 at 169. Gopalan responded that Eastman "can commence loading anytime. We will

15

not hold the loading up for the [GTC] finalization." Dkt. 51-20 at 4; *see also* Dkt. 51-1 at 173-74 (Gopalan Deposition). Martinez Torres then began sending orders even though the parties had not agreed to a GTC. Dkt. 51-1 at 174. She later told fellow Eastman employees that "~3kMT for 2023 … is the volume that we have committed to Wilmar." Dkt. 54-6 at 2 (April 5, 2023 email).

As a final point, Eastman argues that the proposed GTCs provide evidence of the party's intention to only be bound by a formal contract because "every version of the draft GTCs … expressly contemplated a signed agreement." *See* Dkt. 51 at 19-20; *see also* Dkt. 51-15 § 15.10 (GTC provision stating that exchange of copies and signature page "shall constitute effective execution"). But language *contemplating* a fully executed agreement does not foreclose the possibility that a contract could still exist without one. Indeed, whether the parties required a formal signature before being contractually bound depends on "the full context of the parties' negotiations …." *Tricon Energy Ltd. v. Vinmar Int'l, Ltd.*, 718 F.3d 448, 455 (5th Cir. 2013) (quotation omitted) (unsigned signature lines were not conclusive). And the course of negotiations between Wilmar and Eastman raises fact questions about whether and when they intended to be bound. Summary judgment should be denied on Wilmar's claim for breach of a 2023 contract.

**B.      Disputes of fact also preclude summary judgment on the claim for breach of the 2022 contract.**

For Count II, Wilmar pleaded that the parties had enforceable quarterly contracts in 2022 under which Eastman failed to fully perform.  Dkt. 45 at 6-7.  Specifically, Wilmar maintains that Eastman had agreed to purchase 1,500 metric tons of glycerin at $1.10/lb from March to June 2022 ("second quarter agreement") and 1500 metric tons at $1.06/lb from July to September 2022 ("third quarter agreement").  *Id.* at 3.

The record shows that Eastman did not purchase the full volume for either quarter.  *See* Dkt. 51-11 at 8-9 (Gopalan's and Martinez Torres's emails about "backlog" of 1,611 metric tons—477 metric tons under second quarter agreement and 1,134 metric tons under third quarter agreement).  Regardless, Eastman maintains that there were no quarterly contracts and, even if there were, Wilmar cannot show it tendered performance.  Dkt. 51 at 26.  Both issues raise genuine disputes of material fact that preclude summary judgment.

1.      Whether the parties had quarterly contracts in 2022 raises fact questions.

Like with Count I, Eastman maintains that the parties' emails comprising the alleged "second and third quarter agreements" were merely negotiations.  In Eastman's view, only the individual purchase orders were enforceable contracts.  Dkt. 51 at 28.  Wilmar responds that the parties' correspondence about the two quarters "easily satisf[ies]" the UCC's standard

17

for an enforceable contract.  Dkt. 54 at 17.  Plenty of record evidence supports Wilmar's position.

In support of its argument, Eastman relies largely on a purported "admission" from Wilmar.  *See* Dkt. 51 at 27-28.  For its first interrogatory, Eastman asked Wilmar to "identify the terms of any alleged agreement" for 2022.  *See* Dkt. 51-9 at 4.  Wilmar responded that "the agreements for the sale of glycerin by Wilmar to Eastman were handled through email correspondence and Wilmar's acceptance of individual, shipment specific, purchase orders from Eastman."  *Id.*  The response also referred to the underlying documents.  *Id.*  Wilmar also noted that "[a]dditional details" could be found in its response to Interrogatory No. 2.  *Id.*  That next interrogatory asked Wilmar to identify "(1) the purchase order number, (2) the purchase order date, (3) price, (4) quantity, (5) shipment and/or delivery date, (6) invoice date, and (7) invoice number" for each purchase order between 2021-2023.  *Id.*  Wilmar provided that information in a chart.  *See id.* at 4-16.

Eastman says this answer "confirm[s]" that only the purchase orders are enforceable contracts.  Dkt. 51 at 27-28.  This reading is strained at best. Wilmar's response explicitly refers to *both* the emails and the purchase orders, which is consistent with its position that the 2022 "agreements were memorialized in email correspondence and implemented through purchase orders and shipments."  Dkt. 54 at 17.  And Wilmar invokes its response to

18

Interrogatory No. 2 regarding purchase orders only for "additional details"—not the basis for the contract.

Further, "interrogatory responses are not binding judicial admissions …." *Bradley v. Allstate Ins. Co.*, 620 F.3d 509, 527 n.21 (5th Cir. 2010). And an evidentiary admission, as opposed to judicial admissions, "may be controverted or explained by the party who made it." *Martinez v. Bally's La., Inc.*, 244 F.3d 474, 476-77 (5th Cir. 2001) (citation omitted).

Wilmar presented ample controverting evidence that the parties' emails formed quarterly contracts. First, the 2022 emails signal that the parties agreed unconditionally to certain terms. For the second quarter, Ozzella (Wilmar) offered 1,500 metric tons of glycerin at $1.10/lb. Dkt. 51-3 at 5. Martinez Torres (Eastman) responded "I am ok with our normal volume of 1500 +-5% for Q2." *Id.* at 4-5. Ozzella then sent the "Accepted/Confirmed" terms, including volume, price, and delivery period. *Id.* at 3-4. Martinez Torres responded by thanking Ozzella and confirming that the delivery period was March-June 2022. *See id.* at 2-4.

For the third quarter, Ozzella sent Eastman a quote with several terms, including the price and quantity for the July-September 2022 delivery period. Dkt. 51-5 at 5-6. The parties confirmed the price. *See id.* at 3-5. Ozzella then sent Eastman a "confirmation" with the terms, including the quantity of 1,500 MT +-5% tolerance at $1.06/lb. *Id.* at 2. Martinez Torres testified that the

third quarter quote "was accepted by Eastman" and that they "issued a purchase order associated with this" quote.  Dkt. 54-2 at 73.

The parties then began performing according to the foregoing terms. Eastman purchased glycerin from Wilmar at the agreed price for each quarter. *See, e.g.,* Dkt. 51-8 at 6 (May 5, 2022 purchase order reflecting $1.10/lb unit price paid); Dkt. 54-1 at 149 (shipment records).  When Eastman took less than the 1,500 metric tons per quarter, the parties mutually considered the unpurchased volume a "backlog."  *See, e.g.*, Dkt. 54-2 at 88-91 (Martinez Torres deposition).  In fact, the parties' use of the term "backlog" suggests that Eastman had, in fact, committed to buying an overarching quantity.

Eastman's remaining argument relies on Gopalan's testimony that, for the second and third quarters, "there is an email communication followed by an actual sales contract" that would have been sent as a PDF.  *See* Dkt. 51 at 28; Dkt. 51-1 at 83.  But that testimony conflicts with Gopalan's own emails from the time of events.  On December 15, 2022, Gopalan informed Eastman that Wilmar "do[es] not send out a formal contract unless requested."  Dkt. 51-11 at 2.   All these contradictions render it inappropriate to resolve, on summary judgment, whether the parties formed binding contracts for the two disputed quarters in 2022.

2.      Eastman has not shown that Wilmar was unable to tender.

The parties also dispute tender.  Under Texas law, one element of a breach-of-contract claim requires proof of "performance or tendered performance by the plaintiff …." *Wesdem, LLC v. Ill. Tool Works, Inc.*, 70 F.4th 285, 294 (5th Cir. 2023).  "Tender of delivery requires that the seller put and hold conforming goods at the buyer's disposition and give the buyer any notification reasonably necessary to enable him to take delivery."  Tex. Bus. & Com. Code § 2.503(a).

Eastman argues that, for the quantities that Eastman declined to take in 2022, Wilmar did not provide evidence of tender—and cannot show that it did—because it lacked the ability to deliver the full volume.  *See* Dkt. 51 at 29. Wilmar counters that it had the inventory, ability, and readiness to supply the full 1,500 metric tons per quarter.  *See* Dkt. 54 at 21.

On this issue, too, the evidence points different ways.  There is a triable issue as to whether Wilmar was able to—and did—tender the full 2022 volume.

a.      *There is a genuine dispute over the point at which Wilmar fulfilled its delivery obligations.*

Eastman argues primarily that Wilmar was unable to tender the full volume for each quarter.  *See* Dkt. 51 at 29.  It relies largely on certain deposition testimony of Wilmar's business manager, Ozzella, who stated that he did not think "Wilmar had the actual ability to deliver" 1,500 metric tons of

21

glycerin to Eastman in New Jersey or Houston during the second and third quarters of 2022. *See* Dkt. 51-2 at 194-95, 199.

Wilmar responds that the UCC "does not require physical delivery into the buyer's possession, nor does it impose responsibility for downstream logistics on the seller." Dkt. 54 at 20. Rather, "the obligation of the seller is to transfer and deliver and that of the buyer is to accept and pay in accordance with the contract." Tex. Bus. & Com. Code § 2.301. Wilmar's cited authority, *Valero Marketing & Supply Company v. Kalama International*, 51 S.W.3d 345, 352 (Tex. App.—Houston [1st Dist.] 2001, no pet.), affirms that principle.

But Wilmar also notes that the parties' quarterly contracts specify the delivery terms. *See* Dkt. 54 at 21. Assuming the parties' 2022 emails constituted the binding agreement—which is itself a fact question—those communications invoked "Incoterm: FCA Houston" or "Incoterm: FCA Hudson" as the terms of delivery. Dkt. 51-3 at 3 (second quarter agreement "Incoterm: FCA Hudson"); Dkt. 51-5 at 2 (third quarter agreement "Incoterm: FCA Hudson" and "FCA Houston").

The "Incoterms" are the International Commercial Terms, which "provide a set of international rules for the interpretation of the most commonly used trade terms in foreign trade." *BP Oil Int'l, Ltd. v. Empresa Estatal Petroleos de Ecuador*, 332 F.3d 333, 335 (5th Cir. 2003) (quoting International Chamber of Commerce, Incoterms 1990 (1990)). Under the latest

version of the Incoterms, "FCA" or "Free Carrier" "means that the seller delivers the goods to the buyer" at a "named place"—"either at the seller's premises or elsewhere …." Dkt. 61-1 at 5-6 (International Chamber of Commerce, Incoterms 2020 (2020)). If delivery is to occur somewhere other than the seller's premises, then delivery is complete when the goods "reach the named other place and are ready for unloading from the seller's means of transport and at the disposal of the carrier or of another person nominated by the buyer." *Id.* at 5, 8. Once delivery has occurred, the risk of loss and costs pass from the seller to the buyer. *See id.* at 6, 10-11.

Here, the parties' emails reflect that they designated the Hudson and Houston terminals as the "named places" where delivery—and thus, tender—was to occur. *See* Dkt. 51-3 at 3; Dkt. 51-5 at 2, 4. And in practice, Wilmar would deliver the glycerin to the Hudson and Houston terminals, where Eastman would provide railcars for loading. *See, e.g.*, Dkt. 51-2 at 39-40 (Ozzella's testimony); *see also, e.g.*, Dkt. 51-6 at 2 (Eastman waited at the terminal "for a railcar to be loaded"). Because delivery occurred at the terminals, the Incoterms FCA invoked in the parties' emails suggests that Wilmar satisfied its delivery obligations—thereby fulfilling its tender obligation—once the glycerin reached and was ready for unloading from Wilmar's tanks at the terminals. If so, then Eastman bore the responsibility of loading the glycerin from Wilmar's tanks onto Eastman's railcars.

23

On the other hand, the parties' conduct suggests that Wilmar may have assumed responsibility for delivery beyond merely making the glycerin available at the terminal tanks. For example, Eastman's Martinez Torres testified that Eastman "sent the railcars" but that Wilmar "need[ed] to load the railcars in order for [Eastman] to get the" glycerin. Dkt. 54-2 at 89. And Wilmar's Ozzella agreed "that throughout the second quarter of 2022, Eastman was consistently providing railcars to the Hudson Tank Terminal to be loaded" and "was consistently pushing Wilmar to try to work with the terminal to get their railcars loaded faster." Dkt. 51-2 at 90-91.

Those competing facts confirm that whether Wilmar's tender obligation was fulfilled upon making its glycerin available at the terminals, or instead only upon loading the glycerin on Eastman's railcars, cannot be resolved at this juncture. Those disputes of fact are reserved for the jury.

> b.  *Fact issues remain about the adequacy of Wilmar's inventory at the terminals.*

Assuming that Wilmar satisfied its obligation to tender the glycerin by making it available at the terminal for Eastman to load, there is also a fact dispute about Wilmar's inventory levels at the terminals. Wilmar maintains that it had adequate glycerin available. *See* Dkt. 54 at 22. Eastman does not challenge the inventory levels *per se*, pivoting instead to Ozzella's testimony

on Wilmar's ability to *deliver* the glycerin—i.e., the fact issue addressed above. *See* Dkt. 57 at 14.

Wilmar argues that Eastman "isolated" and "misconstrued" Ozzella's testimony, largely because he lacked personal knowledge of Wilmar's inventory at the terminals. *See* Dkt. 54 at 21-22; *see* Dkt. 51-2 at 189 ("I don't know what our tank levels were."). Indeed, Ozzella's testimony indicates that the delivery issues he had described were largely caused not by low glycerin supply, but by congestion at the terminal that delayed the loading process. *See* Dkt. 51-2 at 189 ("[A] lot of delays weren't due to product availability. They were due to congestion. We did have product in other tanks available to them."); *see also id.* at 190 ("the challenge" was "the practical reality of Eastman actually taking possession of the glycerin" and that was attributed "mostly" to "congestion and getting railcars loaded"); *id.* at 190 (Wilmar "did have product" at the Hudson and Houston terminals in 2022).

Moreover, Wilmar submitted declarations from Ozzella and Gopalan indicating that Wilmar had an adequate supply of glycerin at both terminals to tender the full volumes. After reviewing Wilmar's inventory records "for the relevant time," Ozzella declared "that Wilmar maintained glycerin in its tanks at both the Hudson and Houston locations during that period at an amount sufficient to supply Eastman." Dkt. 54-1 at 3. And Gopalan declared, based on records, "that Wilmar maintained glycerin in its tanks at both the Hudson

and Houston locations during the second and third quarters of 2022 in quantities sufficient to supply Eastman." Dkt. 54-3 at 3; *see also id.* (asserting "Wilmar had ample glycerin available for Eastman at its Hudson and Houston tanks throughout" those quarters). There is enough evidence to show that Wilmar could satisfy its obligation to deliver and tender the promised amounts.

        c.      *The Court can reasonably infer that Wilmar did tender.*

The foregoing conclusions largely foreclose Eastman's alternative contention that Wilmar presented no evidence that it did, in fact, tender the remaining volume by putting it and holding it for Eastman's loading and providing notice that reasonably enabled Eastman to take delivery. Dkt. 57 at 15 (quoting Tex. Bus. & Com. Code § 2.503(a)). As already observed, Wilmar proffered evidence that the glycerin was available at the terminals for Eastman to pick up. *See, e.g.*, Dkt. 54-3 at 3 ("Wilmar had ample glycerin available for Eastman at its Hudson and Houston tanks ....").

And on the notice requirement, the record is replete with emails wherein Wilmar attempted to coordinate with Eastman how and when it would purchase the full volume under the 2022 contracts. *See, e.g.*, Dkt. 51-7 at 2 (informing Eastman on May 18, 2022 that Wilmar has glycerin at Houston and Hudson terminals); Dkt. 51-11 at 10 (Ozzella's December 7, 2022 email asking if Eastman will be taking backlog from the 2022 contract in the first quarter of

2023); *id.* at 9 (Wilmar's Gopalan asking if Eastman expects to consume the 2022 backlog in the second quarter of 2023). Viewing the facts in the light most favorable to Wilmar, *see Bluebonnet Hotel Ventures, LLC v. Wells Fargo Bank, N.A.*, 754 F.3d 272, 276 (5th Cir. 2014), that is enough to raise a genuine issue of material fact. This Court should deny summary judgment on the 2022 breach-of-contract claim.

### C.   The unjust enrichment claim fails.

As an alternative to its claim that Eastman breached a 2023 contract, Wilmar contends (in Count III) "that Eastman was unjustly enriched by submitting purchase orders and paying invoices based on a price of $0.75 per pound for Wilmar's glycerin." Dkt. 45 at 7. Wilmar alleges that this lower unit price "was based on negotiations requiring the purchase of 3,211 metric tons." *Id.* Eastman argues that this claim fails because (1) "the 2023 purchase orders were" express contracts that foreclose an unjust enrichment claim, and (2) Wilmar cannot show "undue advantage." Dkt. 51 at 24. Because Eastman's first point is correct, there is no need to address the second.

"Generally speaking, when a valid, express contract covers the subject matter of the parties' dispute, there can be no recovery under a quasi-contract theory ... because parties should be bound by their express agreements." *Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 684 (Tex. 2000); *see also Baxter v. PNC Bank Nat'l Ass'n*, 541 F. App'x. 395, 397 (5th Cir. 2013) (no

27

recovery for unjust enrichment "when the same subject matter is covered by an express contract"). Eastman argues, and the undersigned agrees, that the parties' dispute concerns *which* contract controls Eastman's glycerin purchases in 2023—not *if* a contract exists. *See* Dkt. 51 at 25. That is, if no overarching agreement for 2023 exists, then the parties' transactions were governed instead by the individual purchase orders. *See, e.g.*, Dkt. 51-21 (purchase order for 187,393.076 lbs of glycerin at $.75/lb). Those purchase orders cover the subject matter of the parties' dispute (the price of glycerin paid per unit). Because the purchase orders are contracts, an alternative unjust enrichment claim is not available. *See, e.g.*, *TIB--The Indep. BankersBank v. Canyon Cmty. Bank*, 13 F. Supp. 3d 661, 672 (N.D. Tex. 2014) (rejecting unjust enrichment claim because the dispute concerned which of two contracts controls).

Wilmar's cited case law is distinguishable. *See* Dkt. 54 at 25. This case does not concern unusual circumstances that the parties neglected to contemplate before contracting. *Cf. Eun Bok Lee v. Ho Chang Lee*, 411 S.W.3d 95, 111 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (unjust enrichment was an appropriate equitable remedy in a landlord-tenant dispute because "the parties never contemplated" that certain equipment used during the tenancy would "revert back to the landlord upon the expiration of the lease"). Nor does the dispute concern goods that the agreement fails to address. *Cf. McLeod v. McLeod*, 644 S.W.3d 792, 810-811 (Tex. App.—Eastland 2022, no pet.) (jury's

finding of unjust enrichment was sound because the express agreement did not address the items of property at issue). Rather, there are only two possible scenarios: either the parties had an enforceable contract for the whole of 2023 or just the individual purchase order agreements. Either way, an express contract would foreclose recovery for unjust enrichment. Eastman is entitled to summary judgment on Count III.

## II.    **Wilmar's damages expert is excluded.**

Eastman also moved to exclude Wilmar's damages expert, Karl L. Killian, who proffered opinions about Wilmar's damages for its breach-of-contract and unjust enrichment theories. As concluded *supra* Part I.C, the unjust enrichment claim is barred as a matter of law. So the motion to exclude Killian's opinion concerning unjust enrichment damages is denied as moot. *See, e.g., Shanklin v. Columbia Mgmt. Advisors, LLC*, 2008 WL 4899631, at *18 (S.D. Tex. Nov. 12, 2008) (denying motion to exclude expert testimony on damages as moot for claim that was dismissed on summary judgment).

As for Killian's assessment of Wilmar's damages for breach of contract, the Court concludes that his opinions are both irrelevant and unreliable. His expert testimony is therefore excluded.

## A.   Standard governing admissibility of expert testimony

Under Federal Rule of Evidence 702,

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if ... (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  To justify admitting an expert's testimony, the proponent of that testimony must show, by a preponderance of the evidence, "that (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable." *Stage Completions, Inc. v. Dissolvalloy, LLC*, 2021 WL 4888935, at *1 (S.D. Tex. June 21, 2021); *see also Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998).

If an expert witness possesses the requisite qualifications to testify as an expert, the court must then assess the reliability and relevance of the expert's testimony.   The reliability inquiry examines "whether the reasoning or methodology underlying the testimony is scientifically valid." *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592-93 (1993)).   For this determination, courts consider numerous non-exclusive factors: (1) "whether a theory or technique ... can be (and has been) tested"; (2) whether it "has been

30

subjected to peer review and publication"; (3) "the known or potential rate of error"; and (4) whether the approach is generally accepted within the relevant scientific community. *See Daubert*, 509 U.S. at 593-94. The inquiry, however, is "a flexible one" that focuses "solely on principles and methodology, not on the conclusions they generate." *Id.* at 594-95. The ultimate decision whether to admit an expert's opinions lies in the district court's discretion. *See Whitehouse Hotel Ltd. P'ship v. Comm'r*, 615 F.3d 321, 330 (5th Cir. 2010).

### B.    Overview of Killian's damages opinion

Killian's report opined on Wilmar's economic damages. *See* Dkt. 58-1 at 6. Regarding the parties' contract in 2023, Killian calculated the income that Eastman's "purchase of the outstanding volume would have resulted in" by multiplying the agreed unit price of $.75/lb by the 2,134 metric tons that Eastman allegedly promised, but failed, to purchase. *Id.* at 8. From that sum, Killian subtracted the $1.5 million that Wilmar earned selling the unpurchased glycerin to other customers. *Id.* at 8-9. Killian concluded that Wilmar suffered approximately $2 million in damages due to Eastman's failure to purchase 2,134 metric tons of glycerin in 2023. *See id.* at 6, 9.

Killian later supplemented his report to calculate damages for Wilmar's 2022 breach-of-contract claim. *See* Dkt. 58-2. For the second quarter agreement, Killian multiplied the unpurchased volume of 477.04 metric tons by the agreed price of $1.10/lb. *See id.* at 3. For the third quarter agreement,

he multiplied the 1,134.37 metric tons of unpurchased volume by the unit price of $1.06/lb. *See id.* He then subtracted the profit made through mitigation from the combined sum for both quarters. *See id.* This yielded a "net lost sales value" of $ 2,717,139. *Id.*

### C. Killian's opinion on the breach-of-contract damages is irrelevant and unreliable.

Eastman contends that Killian's breach of contract damages calculation was "irrelevant, unreliable, and unhelpful" because the calculation was not based on market price, as required by Section 2.708 of the UCC. Dkt. 53 at 4-5. The parties agree that damages should be calculated under Section 2.708. *See id.* at 1; Dkt. 58 at 5. And Killian's report claims that his calculation "is predicated on Texas Business and Commerce Code 2.708." *See* Dkt. 58-1 at 7. Killian simply did not perform that calculation.

#### 1. UCC damages under Section 2.708

Under the UCC, "if the buyer *accepts* the disputed goods, the seller is entitled to the contract price of those goods." *Trident Steel Corp. v. Vecta Oil & Gas, Ltd.*, 2017 WL 3671299, at *1 (S.D. Tex. July 17, 2017) (emphasis added) (citing Tex. Bus. & Com. Code § 2.709). But if the buyer does *not* accept the goods—which is what happened here—"the seller may only be entitled to the market price for those goods" under Section 2.708(a). *Id.* (citing Tex. Bus. & Com. Code § 2.708); *see also Leeman Labs, Inc. v. Enreco, Inc.*, 7 F.3d 229

32

(5th Cir. 1993) (Section 2.708 "permits recovery by a seller of the difference between the contract price and the market value of the goods"). The market value is determined "at the time and place for tender ...." Tex. Bus. & Com. Code § 2.708(a).

Section 2.708(b) does provide an alternative measure of damages consisting of "the profit (including reasonable overhead) which the seller would have made from full performance by the buyer ...." *Id.* § 2.708(b). But that alternative is available *only if* subsection (a)'s market-price measure "is inadequate to put the seller in as good a position as performance would have done ...." *Id.*; *see also Tri-State Petroleum Corp. v. Saber Energy, Inc.*, 845 F.2d 575, 580 (5th Cir. 1988) (applying subsection (b) only "when subsection (a)'s measure is insufficient").

2. <u>Killian calculated the wrong measure of damages, rendering his opinion irrelevant and unreliable.</u>

Under Section 2.708(a), Wilmar's contract damages are limited to the market price of the unpurchased glycerin at the time and place of tender. But that is not what Killian calculated. Instead, Killian determined the difference between the profit Wilmar would have made under the contracts themselves ($1.10/lb for the second quarter of 2022, $1.06/lb for the third quarter, and $.75/lb for 2023 multiplied by the outstanding volume for each delivery period) and the profit Wilmar made from mitigating its damages. *See* Dkt. 58-1 at 8;

33

Dkt. 58-2 at 2-3. That method results in a *lost profits* figure—not the product's market price. Nowhere does Killian's report mention or purport to explain the glycerin's market price at the time of tender. This is important because the measure of damages in Section 2.708—i.e., market price at the time of breach— is conceptually distinct from a plaintiff's subsequent attempts to mitigate its damages. *See JCB, Inc. v. Horsburgh & Scott Co.*, 597 S.W.3d 481, 487 n.3 (Tex. 2019) (citing mitigation of damages as an instance where damages measured at the time of breach under Section 2.708(a) "can increase or decrease after the breach"). Because Killian applied the wrong legal standard for recoverable damages, his opinion is irrelevant. *See AIG Eur. LTD. v. Caterpillar Inc.*, 2019 WL 8806217, at *8 (E.D. Tex. Oct. 3, 2019) (portion of report applying the wrong standard for damages was excluded as irrelevant), *aff'd*, 831 F. App'x 111 (5th Cir. 2020); *Mize v. BMW of N. Am., LLC*, 2021 WL 5571165, at *7 (N.D. Tex. Oct. 1, 2021) (expert's damages opinion was irrelevant because it used the wrong standard).

Wilmar insists that Killian "did not ignore market price evidence," but rather relied on "arm's-length sale transactions for the same product, during the same time period" to determine the market price. Dkt. 55 at 2. That gloss is nowhere in Killian's report. And as Eastman correctly argues, Dkt. 58 at 10, a party's post hoc explanation cannot salvage an expert's deficient methodology. *See Jacked Up, LLC v. Sara Lee Corp.*, 807 F. App'x 344, 349

34

(5th Cir. 2020) (per curiam) (rejecting party's "post hoc rationalization" of expert's damages methodology); *see also DeWolff, Boberg & Assocs., Inc. v. Pethick*, 2024 WL 1396267, at *10-11 (N.D. Tex. Mar. 31, 2024) (rejecting party's "attempt to fill the gaps" of damages report), *aff'd on other grounds*, 133 F.4th 448 (5th Cir. 2025).

Even if Killian intended to calculate the market price according to the resale profit—although the report manifests no such intent—his opinion is unreliable. Wilmar cites the principle that "[m]arket value may be calculated by using comparable sales." Dkt. 55 at 4 (quoting *Exxon Corp. v. Middleton*, 613 S.W.2d 240, 246 (Tex. 1981)). But "[c]omparable sales [] are those comparable in time, quality, quantity, and availability of marketing outlets." *Exxon*, 613 S.W.2d at 246. That analysis is missing from Killian's report.

Killian never attempts to explain how or why Wilmar's mitigation sales could adequately inform market value. This is hugely problematic because the price of glycerin fluctuated significantly, including on a month-to-month basis. *See* Dkt. 58-3 at 36, 207-08. The record also shows that Wilmar's time of tender was not static. Although the alleged contracts would span several months, Eastman typically took and paid for only a portion at a time, without a regular shipping schedule. *See, e.g.*, Dkt. 54-3 at 148 (shipments on June 10th, 13th, and 14th, 2022, but then no shipments until July 7, 2022).

35

Yet Killian performed no analysis and cited no data indicating that the market price at the various points of tender throughout 2022 and 2023 would accurately be reflected by the price paid by another buyer months after-the-fact, in November 2023, December 2023, and January 2024, in this volatile market. *See* Dkt. 58-2 at 2-3; Dkt. 58-1 at 8-9. The vast "analytical gap" between Killian's damages opinion and the underlying data renders his opinions unreliable even assuming that he attempted to apply the correct measure of damages under Section 2.708(a). *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (permitting courts to exclude expert testimony as unreliable if "there is simply too great an analytical gap between the [basis for the expert's opinion] and the opinion proffered").

### 3.    Killian limited his damages opinions to Section 2.708(a).

Wilmar's further attempts to salvage Killian's opinions are not convincing. For instance, Wilmar criticizes Eastman for "assum[ing] § 2.708(a) provides the exclusive measure of damages" here. Dkt. 55 at 4. But those are the damages Killian claims to calculate, and what this Court must assess. *See* Dkt. 58-1 at 7 (quoting "Subsection (a)" of "Texas Business and Commerce Code 2.708"). Killian did not invoke the lost-profits alternative in Section 2.708(b). So Wilmar cannot recast Killian's calculations as a Section 2.708(b) opinion.

Moreover, Wilmar has submitted no evidence that default market-value damages under Section 2.708(a) would be inadequate, which precludes it from

36

seeking recovery under Section 2.708(b). *See, e.g.*, *UniWell Lab'ys, LLC v. Frain Indus. Inc.*, 2024 WL 385698, at *12 (N.D. Tex. Feb. 1, 2024) ("[B]ecause there is no evidence that the measure of damages set forth in subsection (a) of section 2.708 is inadequate, Defendants cannot recover damages under subsection (b) ...."), *aff'd sub nom.* 2025 WL 1099692 (5th Cir. Apr. 14, 2025); *see also Garza v. Dealers Elec. Supply*, 2004 WL 1193698, at *2 (Tex. App.— Houston [14th Dist.] June 1, 2004, no pet.) (no damages under subsection 2.708(b) where "there is no evidence in this case that the damage measure in subsection 2.708(a) is inadequate, so as to make subsection 2.708(b) applicable"). Accordingly, any opinion about damages under Section 2.708(b) would be irrelevant even assuming that Killian purported to offer one.

In sum, Wilmar failed to establish that Killian's opinions are relevant and reliable under Fed. R. Evid. 702. His opinions are therefore excluded.

## Recommendations and Conclusion

For the foregoing reasons, it is **RECOMMENDED** that Eastman Chemical Company's motion for summary judgment (Dkt. 51) be **GRANTED IN PART** as to the unjust enrichment claim (Count III) and **DENIED IN PART** as to the breach-of-contract claims (Counts I and II).

It is further **ORDERED** that Eastman's motion to exclude (Dkt. 53) expert Karl L. Killian's opinions is **GRANTED** as to the breach-of-contract damages and **DENIED AS MOOT** as to the unjust enrichment damages.

37

The parties have fourteen days from service of this Report and Recommendation to file written objections.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).    Failure to file timely objections will preclude appellate review of factual findings and legal conclusions, except for plain error.  *Ortiz v. City of San Antonio Fire Dep't*, 806 F.3d 822, 825 (5th Cir. 2015).

Signed on June 9, 2026, at Houston, Texas.

_____
Yvonne Y. Ho
United States Magistrate Judge